IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

LAKES GAS COMPANY,            )
                             )
              Plaintiff,      )    **CIVIL ACTION**
                             )
v.                           )    No.  08-1293
                             )
CLARK OIL TRADING COMPANY,    )
                             )
              Defendant.      )
_____)

## MEMORANDUM AND ORDER

This is a commercial dispute between companies that buy and sell propane gas. Plaintiff Lakes Gas Company claims Defendant Clark Oil Trading Company converted propane that belonged to Lakes. Alternatively, it contends Clark Oil was unjustly enriched and must pay the value of the propane that Clark Oil received. Clark Oil denies that it is liable. The matter is now before the court on the parties' cross-motions for summary judgment.

## I. INTRODUCTION

The claims spring in part from the conduct of a third entity, Summit Propane, and its owner Dave Stevenson.  At times Stevenson acted as a sales representative for  Lakes, taking orders for sales of Lakes' gas and receiving commissions from Lakes. In a series of transactions - apparently going back several years – Stevenson arranged to sell propane to  Clark Oil by misrepresenting that Stevenson's own company (Summit) owned the gas. In fact the gas belonged to Lakes. Stevenson convinced Lakes to transfer the propane to  Clark Oil by yet another misrepresentation, this time that the gas was being sold to Lakes' customers and that Clark Oil would merely

hold the gas in storage for Lakes' customers.

After the gas was transferred from Lakes' account to Clark Oil's account at a storage facility, Clark Oil would pay Stevenson for the gas. Lakes would then bill its customers for the gas. For several years, Lakes apparently received payment from its customers and/or from Stevenson and the transactions continued. In mid-2008, however, things came to a screeching halt. Stevenson suddenly ceased operation and Lakes received no payments on a number of propane transfers it made to Clark Oil in July 2008.

Lakes now contends Clark Oil is liable for conversion and for unjust enrichment, saying Stevenson had no title to the gas and that Clark Oil obtained no better title than Stevenson. Clark Oil denies liability, arguing that Lakes knowingly entrusted the gas to Stevenson and that Clark Oil was a good-faith buyer in the ordinary course of business. Additionally, Clark Oil argues the claims are barred by equitable defenses because Lakes knew that Stevenson had a history of using straw purchasers in sales transactions.

## II.   FACTS

The court finds the following facts to be uncontroverted for purposes of summary judgment.

### A. The Parties & Background.

Lakes Gas Company is a wholesaler of propane gas in Midwestern states. When it trades in large quantities of gas, it uses the brand name North America Energy (NAE). It is the twelfth largest propane retailer in the U.S., with average sales of about 50 million gallons of propane a year. It has 280 employees, 18 of whom work in the company's home office in Forest Lake, Minnesota. Howard Sargeant

is the President of Lakes Gas and owns 99% of the company.  Steven Sargeant is the Vice President and General Manager.  Jane Boyer is the Accounting Supervisor.  Boyer supervises a staff of 7 who are responsible for the company's administrative and bookkeeping work. She reports to Steven and Howard Sergeant.  Until October of 2008, Patty Balfanz was one of Boyer's direct reports.  Balfanz prepared invoices, bills of lading, shipping reports, and recorded payments from customers on Lakes' Product Transfer Order (PTO) transactions.

Clark Oil is a Missouri trading company[1] that buys and sells various hydrocarbons, including propane.  It has about 15 employees, including 5 or 6 traders.  John Hohman is one of Clark Oil's traders. Doug Berhorst is a scheduler for Clark Oil.  Berhorst is responsible for recording trades, issuing PTOs, making arrangements for product transfers, preparing invoices, and billing customers.

B. <u>Propane Storage & Product Transfer Orders (PTOs)</u>.

Mid-Continent Fractionation & Storage, L.L.C. ("MCF"), which is owned by Williams Energy Services, owns and operates an underground liquid gas storage facility in Conway, Kansas.  All of the propane transactions at issue in this lawsuit occurred through the Conway MCF facility.  The maximum storage of the facility is about 20 million barrels.  All of the stored product is commingled in underground storage.  MCF leases storage capacity to third parties.  In July 2008, there were about 30-40 entities leasing storage rights at the Conway facility.

---

[1] Clark Oil is a fictitious name for a partnership of two Missouri corporations – G.I.C., Inc. and NIC, Inc. – each with a principal place of business in Missouri. Doc. 1, ¶3.

A storage lessee at the Conway facility can transfer product to the account of another storage lessee by means of a PTO. A PTO is the method by which Williams Energy documents the transfer of propane stored at its facility from the account of one customer of the facility to another customer of the facility. The PTO system is web-based. MCF issues each storage lessee a user name and login password for the PTO system. An entity which is not a storage lessee at the Conway facility cannot access the system. A storage lessee generates a PTO by accessing the PTO system. As noted above, a PTO can transfer product from the account of one lessee to another at the facility. A PTO is not used to transfer product out of the Conway storage facility or to transfer product from a storage lessee to an entity that does not have storage rights at the Conway facility. (Transfers of product out of the facility are done by truck, rail, or pipeline, and are accomplished with bills of lading or with pipeline tickets.) The industry relies on the PTO to confirm the transfer of inventory gas from one party to another and to identify intermediaries involved without physically moving the gas within the storage facility.

The required fields on the PTO form are: the Issuing Customer, the Receiving Customer, the Product, Volume, Start Date, and Flow Date. The Issuing Customer on a PTO is the entity that generates the PTO. The Start Date is the date the PTO is entered into the system. There is a Comment field on the PTO, although it is not a required field and may be left blank. The industry standard is to use the Comment field to identify the "lineup" of entities which may be parties to the transaction in between the Issuing Customer and the Receiving Customer. It may also be used to make notes about the

-4-

transaction.   It can provide a form of communication between the Issuer and the Receiver of the PTO.

After the Issuer completes the PTO, the PTO system reduces the inventory account of the issuing storage lessee and transfers the inventory volume to the inventory account of the receiving storage lessee.   No physical transfer of product takes place.   After the issuer has completed all required fields in the PTO form, and if the inventory of the issuing customer is sufficient to meet the volume obligation in the PTO, the product transfer is recorded in the MCF accounting system and the Status field indicates the transfer is "Complete."  The system assigns an identification number to each PTO. A storage lessee can use the PTO system to confirm that product has been transferred to its inventory account by another storage lessee. The system provides notification to the issuing lessee and the receiving lessee of the transfer and the volume.   The PTO does not constitute title, nor does it necessarily show a chain of title to the product.

Clark Oil leases storage rights at the Conway facility.   Under its lease, it had a maximum storage right of 75,000 barrels.   Lakes Gas also leased storage rights at the Conway facility.   It had a maximum volume storage right of 10,000 barrels.   If a lessee exceeded its maximum storage rights, MCF would assess an additional daily storage fee of 7.5 cents per barrel.

C. Lakes' Relationship with Dave Stevenson.

Howard Sargeant, President of Lakes, first began doing business with Dave Stevenson in early 2002.   At that time, Lakes acquired a company with which Stevenson was conducting wholesale propane

-5-

transactions.  Additionally, a company operated by Stevenson - Ray Energy - became one of Lakes' customers.  Ray Energy eventually failed to pay Lakes some $2 million on propane trades, prompting Lakes to file suit.  In that litigation, Stevenson gave deposition testimony in which he acknowledged that in 2002-03 he induced a company named C.H. Wilson Transport, Inc. to act as a straw purchaser of propane from Lakes so that Ray Energy could circumvent limitations on its line of credit with Lakes.  Ray Energy would provide C.H. Wilson the money to pay invoices from Lakes. Stevenson also acknowledged that since 1993 he had used Ken Fencl as a fictitious buyer in a similar manner.

Lakes ended up buying a propane terminal in which Ray Energy had an interest.  The purchase price included a payment of $260,000 to extinguish a lien that resulted in part from Stevenson's debt to another company.  In July 2003, Lakes brought suit against C.H. Wilson in state court in Minnesota, seeking to recover nearly $700,000 for propane sales.  Wilson denied that it was the buyer of the propane and brought a third-party complaint against Ray Energy. In connection with that litigation, Lakes determined that Tom Burling - who owned one of the companies acquired by Lakes and who became a Lakes employee under Howard Sargeant - and Stevenson had conspired to buy gas from Lakes by using C.H. Wilson as a straw purchaser.

Stevenson failed to pay Lakes some $3 million for propane trades he had conducted on behalf of NAE.  Howard Sargeant heard that Stevenson also owed Williams Energy as much as $12 million.  The FBI conducted a criminal investigation of Stevenson's dealings and interviewed Howard Sargeant at Lakes' office.  Stevenson's financial problems led him to declare bankruptcy.  For its part, Lakes wrote off

its Ray Energy losses as bad debt.  Howard Sargeant acknowledges that as a result of the prior Wilson litigation, he became aware of Stevenson's practice of using fictitious buyers to circumvent credit limitations.

After all of the foregoing occurred, and despite their knowledge of Stevenson's history, Howard Sargeant and Steven Sargeant jointly decided to continue their business relationship with Stevenson because they felt he possessed very strong talents and "could provide some opportunity to right some of the wrongs."  Howard Sargeant reasoned that by continuing to conduct business with Stevenson, Lakes could recover some of the losses it incurred in prior dealings with him. Steven Sargeant believed that because Stevenson had extensive contacts with propane retailers in Iowa and southern Minnesota, Stevenson could successfully sell to those customers and they could be converted to Lakes customers.

Howard Sargeant met with Stevenson to discuss their relationship.  Howard did not want Stevenson to be an employee of Lakes, so on August 5, 2003, Lakes and Stevenson entered into a "Sales Rep Agreement," which was drafted by Howard and Steven Sargeant. The Agreement stated that Stevenson was an independent contractor for Lakes, not an employee; that he had no authority to contractually bind Lakes or to hold himself out as having that authority; and that he was authorized to take orders for gas and forward them to Lakes' headquarters for approval or rejection.  It provided that Lakes had sole authority to approve each sales transaction submitted by Stevenson.  It also provided that Lakes would reject orders containing a margin of less than 1.5 cents per gallon, a margin that ensured

Lakes would be able to make a profit on each transaction. Because of the built-in margin, the sole risk that Stevenson's transactions appeared to present to Lakes was the possibility of non-payment by a customer.

The Agreement required Stevenson to report to Lakes headquarters personnel "who have supervisory authority over" him. The Agreement set out a base commission of .25 cents (one-quarter cent)per gallon of propane gas on approved sales, plus a possible supplemental commission for each gallon sold up to 50 million gallons. Stevenson agreed not to sell any competing line of propane to Lakes' customers.

Stevenson was the only person with whom Lakes had a relationship of this sort. From 2006 to February of 2009, Lakes' website identified Stevenson as one of the company's wholesale sales representatives. Stevenson operated under the name "Summit Propane." Summit had its offices in Cedar Rapids, Iowa, where Stevenson worked. Lakes imposed certain restrictions on Stevenson, requiring that Lakes send the invoice to the customer and allegedly prohibiting Stevenson from handling money on Lakes Gas's PTO transactions. Lakes did not require Stevenson to provide a financial guarantee. Howard Sargeant would not approve Stevenson's request to conduct a transaction unless Lakes would realize a profit. Sargeant expected Stevenson to have a trade volume in the range of fifty million gallons. Sargeant was not concerned about the transactions during 2008 because Lakes had been doing transactions with those same customers for years. Stevenson arranged large volume transactions that involved the transfer of propane that Lakes stored at the Conway storage facility ("PTO transactions"). In the absence of his business relationship with

-8-

Lakes, Stevenson could not have conducted PTO transactions because Stevenson had no storage rights at the Conway storage facility. Lakes conducted PTO transactions through Stevenson from August of 2003 until August of 2008.

D. Lakes' PTO Transactions.

Lakes conducted its PTO transactions in the name of NAE. Lakes maintained a separate bank account for NAE at Wells Fargo Bank and received daily account statements. It received notification from Wells Fargo by fax or e-mail whenever there was a wire transfer of funds into the NAE account. On its financial statements, Lakes maintained a separate subsection for Stevenson's PTO transactions which was denominated as "wholesale" under a section labeled Hampton. Lakes also maintained a monthly spreadsheet of Stevenson's transactions on which Lakes recorded, for each transaction, the date of the transaction, the name of Lakes' supplier, the name of the customer(s), the volume, and the price. Patty Balfanz prepared the spreadsheet. Aside from Howard Sargeant and Jane Boyer, Stevenson was the only person who conducted PTO transactions for Lakes. Lakes never transferred product by PTO to Stevenson or Summit because neither Stevenson nor Summit had storage rights at the Williams Conway facility.

The customers on the PTO transactions were Lou's, Fencl, D&J Feed Service, Campbell Oil Co., Johnson Oil Co., Kruegel, and Hansen Gas Co. In addition to the PTO transactions, Stevenson conducted wholesale transactions with his customers in which he directly contracted with them on behalf of NAE. Prior to conducting PTO transactions, Lakes obtained a credit application from each customer.

-9-

Each of the PTO customers had bank balances in the range of $30,000 to $70,000. Each customer had two account numbers with Lakes: one for wholesale propane deliveries and one for PTO transactions. The PTO transactions were typically larger, involving a sale in excess of $200,000. There was a 10% prepayment requirement for the wholesale transactions, but not the PTO transactions. Lakes generally required the customer to pay the remaining balance on a PTO transaction within 7 days after the sale.

Stevenson was the only Lakes' representative who communicated with customers on the PTO transactions. After Stevenson received a product order from one of Lakes' customers, Stevenson would call Howard Sargeant to request approval to conduct the proposed transaction. Stevenson could not conduct the proposed transaction without Howard Sargeant's approval. Howard would then call one of Lakes' suppliers to ascertain the price of the propane. If Lakes could acquire it at a price that would ensure a profit, Howard would approve the transaction. On each PTO transaction, Stevenson would convey by telephone to Howard or to Jane Boyer the details of the transaction, which Howard or Boyer would then record on a "PTO Order Form," which set forth the date, the supplier from whom Lakes obtained the gas and at what price, the location, the name of the customer to whom Lakes was selling, any other companies in the "distribution lineup," and the volume and customer price.

Boyer accessed the Williams PTO system to generate a PTO using the information on the Lakes' PTO Order Form. Stevenson would telephone Boyer periodically to confirm that a PTO had been issued and that the propane had been transferred from Lakes' storage account at

the Conway facility.  Boyer was the only Lakes employee who held a login ID and password for the Williams PTO system. Stevenson did not have a login ID or password. Lakes also used its PTO Order Form to generate the invoice that was sent to the customer for payment. On each transaction, Boyer gave Patty Balfanz the PTO Order Form, from which Balfanz generated the customer invoice.  Balfanz forwarded a copy of the PTO to Stevenson. Stevenson did not access the PTO Order Form or generate the customer invoice. Balfanz also recorded payments from customers on PTO transactions.  She devoted about two hours a day to her work on Stevenson's PTO transactions.  On a daily basis, Balfanz or another Lakes employee reconciled the PTO transactions, matching the Wells Fargo account with the customer invoices. Lakes generated a daily or weekly accounts receivable report for its PTO transactions that identified the account balance for each PTO customer.

Some transactions were "split," meaning Lakes sold some portion of the propane reflected on a single PTO to two customers. For example, a July 16, 2008 PTO sale of 10,000 barrels was a split transaction involving the sale of 7,500 barrels to Campbell and 2,500 to Fencl.  In the propane market, it is not the standard practice to conduct a split PTO transaction. One cannot tell from the PTO itself whether a transaction is split or the volume of propane that Lakes was selling to a particular customer.  To determine that, one would have to look at Lakes' PTO Order Form. But Lakes issued a single PTO in split transactions because Williams assessed a fee of $25 to $50 to generate each PTO.

Records show that in about 62 PTO transactions, Lakes sent an

-11-

invoice to Hansen although Hansen does not appear in the lineup on the Comment field of the PTO.  In each of those transactions, "Hansen" was written on the PTO Order Form after the PTO had been issued. Each of these were split transactions.

     E. <u>Lakes' PTOs and Wire Transfer Payments from Summit</u>.

     Stevenson and Summit were not supposed to be handling money in PTO transactions, but Summit made substantial wire transfers into the NAE account in 2007 and 2008.  In 2007, Summit made 71 wire transfers totaling $19.7 million into the account.  Summit made 55 wire transfers into the account in 2008, totaling over $16 million. Summit made 8-12 wire transfers a month into the account in 2008.  Whenever a wire transfer came into the NAE account, Lakes would receive a wire notification by fax or email from Wells Fargo.  Boyer received the notifications and would have given them to Balfanz. A Lakes employee (almost always Balfanz) would make a handwritten notation on the wire transfer account regarding posting the funds to a customer's account. After Boyer received it, she would look at the customer notation and reconcile the amount of the transfer with the customer's account. When Boyer received these notifications and reconciled the accounts, she purportedly failed to recognize that the wire transfers were being made by Summit. She testified that she failed to recognize the reference to Summit on each of the notifications, and that she was not aware that Summit had been making wire transfers into the NAE account for several years up to July 2008.  She said if she had known, she would have been concerned because Lakes was not selling propane to Summit but rather to its PTO customers. Boyer testified that she did not speak to Balfanz about Stevenson's wire transfers.

Boyer also testified she may have made the notation that appears on an April 25, 2008 wire transfer detail report of a wire transfer in the amount of $722,404.15.  The hand-written notation reads, "short paid per Dave," indicating that someone at Lakes Gas had been informed of this circumstance by Dave Stevenson.

Steven Sargeant testified that until he witnessed Boyer's deposition in this case in April 2010, he was unaware that Stevenson had made substantial wire transfers over an extended period into the NAE account.  Lakes had reconciled each of these transfers with invoices to its PTO customers and recorded the payments in the respective customer's account.

Clark Oil contends there are material discrepancies in Lakes' transactional documents relating to the PTOs.  For example, Clark Oil pointed out a PTO order and invoice dated May 20, 2008, that refers to a later (June 3, 2008) transaction. Clark Oil also cites a Summit wire to Lakes for $565,162 on July 16, 2008, with a reference to "Krugel" in the wire, although there is apparently no Lakes record showing a Kruegels transaction that the payment would apply to. By putting "Krugel" on the wire transfer, Stevenson was instructing Lakes on how to apply the funds. Another transaction was done with Kruegels the day after Lakes received the foregoing wire transfer.

Clark Oil also identified a Lakes invoice to Hansen where Hansen was not identified in the Comment field of the PTO. Balfanz had made a handwritten notation reflecting "Hansen" on the PTO Order Form. This was done on some 62 transactions, with Hansen being handwritten in and invoiced for the propane. Balfanz was amending the PTO Order Form to reflect Hansen's purchase after the PTO had been issued. Boyer is

certain that she and Howard Sargeant did not instruct Balfanz to do so, and the only reasonable possibility she could think of was that Dave Stevenson told her to do so.  Howard and Steven Sargeant had no explanation regarding the discrepancies in the Hansen transactions.

Clark Oil Exhibit 52 is a June 2, 2008 PTO in a transaction between Lakes Gas and Lou's.  The second page of the exhibit is Lakes' June 2, 2008 invoice to Lou's in the amount of $539,437.50.  Summit's July 31, 2008 bank statement evidences a July 3, 2008 wire transfer in the amount of $539,437.50 from Summit to NAE (Lakes).  The Summit wire transfer was made on July 3, 2008, approximately 30 days after the Lakes' invoice to Lou's.  This payment was well outside the 7-day window for payment on Lakes' sales. Lakes' records did not show the customer account to which the July 3, 2008 wire transfer was applied. On the day of the July 3, 2008 wire transfer, Lakes made another PTO sale to Lou's.  Howard Sargeant's practice was to condition his approval of a transaction with a customer on the customer satisfying its account balance. A July 3, 2008 NAE invoice to Lou's shows a sale in the amount of $546,105.  A July 23, 2008 Wells Fargo notification shows a Summit wire transfer to the NAE account, also in the amount of $546,105, and it references Lou's. The wire notification bears a handwritten notation by Balfanz referencing Lou's account ("Lou's 01603"). This payment is beyond Lakes' 7-day payment period (20 days past due). Other documents show that Lakes did another transaction with Lou's on the day after the July 23, 2008 wire transfer. The documents show a course of dealing wherein Lakes received a late payment in the form of a wire transfer from Summit and then immediately conducted another transaction with Lou's.

-14-

Clark Oil Exhibit 48 is a July 10, 2008 NAE price sheet. It bears Boyer's handwritten notation, "disregard per Dave." Lakes issued NAE price sheets on a daily basis, with prices set by Howard Sargeant. The NAE price sheet states that NAE's office is in Cedar Rapids, Iowa – which is the location of Summit's office. It provides telephone and fax numbers for NAE that are in fact Summit's numbers. Boyer testified she does not remember where the price sheet came from; that Stevenson might have emailed it to her; and she does not remember why she wrote "disregard per Dave."

     F. <u>Clark Oil – Dave Stevenson Transactions</u>.

Clark Oil and John Hohman first began trading with Stevenson in the early 2000s, when Stevenson was employed by Fencl. Hohman and Stevenson bought and sold propane from one another. The subject of those trades was propane that was stored at the Conway storage facility. Hohman ceased trading with Stevenson in 2003 when Stevenson experienced financial problems. Stevenson failed to pay Clark Oil about $80,000 on propane trades in 2003, although he eventually repaid Clark Oil in several payments at some point around September 2003.

In August 2005, Stevenson contacted Hohman about renewing his trading relationship with Clark Oil and Hohman. Stevenson told Hohman that he had formed a new company named Summit Propane and that he was trading again. Hohman required Summit to make a prepayment of 10% of the invoice price on a trade and to maintain a 20% cash equity margin in its account as collateral. Hohman also required a cash equity prepayment on transactions in which Summit sold propane to Clark Oil to be transferred in the future, because if Summit were to fail to deliver the product, Clark Oil could be required to cover it at a

higher price. If Summit exceeded its equity margin, Stevenson would either close out his open positions or wire additional funds to Clark Oil to cover the deficiency.

In July 2008, Summit maintained its 20% equity margin. Clark Oil did not feel insecure about its financial position with Summit at any time in July 2008. On "wet" sales to Summit (those involving the immediate transfer of the product), Clark Oil required payment on the day of the transaction. Clark Oil and Hohman bought propane from Summit and sold propane to Summit. In selling propane to Summit in PTO transactions, Clark Oil did not deliver product to Summit's inventory or identify Summit as the receiving customer, because Summit did not have storage rights at the Conway facility. Rather, Stevenson would inform Berhorst who should be named as the receiving customer on Clark Oil's PTO. Clark Oil would include Summit in the lineup on the PTO. The transactions generally involved a lineup of Clark Oil to Summit to Heartland to Plains. When Summit sold propane to Clark Oil, Berhorst would access Clark Oil's account on the PTO system to confirm that a PTO had been issued transferring the product to Clark Oil. Summit would issue an invoice to Clark Oil when it purchased propane.

All of Clark Oil's transactions with Stevenson were with Summit. Hohman, a Clark Oil trader, believed that Stevenson was simply operating a trading company. Hohman did not know where Summit was acquiring the propane that was the subject of Stevenson's transactions with Clark Oil, but he believed it was coming from Summit's trading partners or customers. Stevenson never mentioned Lakes Gas, and Berhorst believed that he was dealing with Summit.

Despite repeated requests by Berhorst, Stevenson never had

-16-

himself listed in the PTO lineup when Lakes Gas was the issuer of the PTO. It eventually became the "standard business practice" for Berhorst to write the name "Summit" into the PTO lineup where Lakes Gas was the issuer.

Berhorst said he did not consider Summit's omission from the distribution lineup on the PTOs from Lakes to be suspicious because Berhorst believed the only purpose of naming Summit there is to provide a reference in Clark Oil's transactional documents. Clark Oil did not know of Stevenson or Summit's relationship with Lakes and thought Stevenson and Summit were trading on their own account because Stevenson "never made reference that he was with Lakes at all."

Hohman, in addition to being a trader with Clark Oil, owns a fractional interest in Clark Oil's parent company. He traded the PTO orders at issue with Stevenson. He testified that his understanding was that "I was buying barrels from Summit and he was getting them from somebody and the issuer of the PTO ended up being Lakes." He thought Summit was not an agent of Lakes and was merely trading as an independent party. Hohman said he did not care where Stevenson was getting the product, as long as Clark Oil received it.

When Hohman and Stevenson agreed on a deal, Hohman would write up the agreed price and quantity on a piece of paper and give it to his assistant, who would enter it in the Clark Oil computer system and assign it an internal contract number. No written contract was entered into between Summit and Clark Oil in these instances and no contract was sent to Summit. Summit sent invoices to Clark Oil when Clark Oil purchased propane from Summit, and Clark Oil invoiced Summit when Summit purchased propane from Clark Oil.

In 2005, Summit sold propane to Clark Oil on one occasion. In 2006, the number of transactions increased. There were occasions when Clark Oil would engage in both buy and sell transactions with Summit on a single day. Such trades typically occur when a trader purchases propane in the belief that the market is going up, but later in the day the market price goes down, which induces the trader to sell.

In the first quarter of 2008, Hohman increased Summit's prepayment requirement to 20% of the invoice price because propane prices were increasing. In early July 2008, Stevenson informed Hohman that he was closing his books; that is, closing his market positions on open transactions. In phone conversations on July 14 and 17, 2008, Stevenson told Hohman that a person in Florida who was providing him with financial support was leaving the business because of a divorce. Hohman assumed that Stevenson was liquidating his position because of that circumstance, although Hohman thought that Summit would continue to do business. Hohman spoke with Stevenson a couple of days before August 6, 2008.

There are 50 to 100 propane traders in the United States. The price of propane is generally 50 to 70 per cent of the price of oil. Winter demand for propane is filled in the summer months. Historically, July is a low-demand month, so it is not unusual for traders to offer propane at a reduced price in July. In July 2008, propane prices were higher than normal owing to the price of crude oil. The propane market in July 2008 was volatile, with prices starting the month at $1.82 a gallon and falling by the end of the month to $1.68 a gallon.

G. Disputed PTOs and Cessation of Business by Summit.

-18-

From the beginning of her employment in 2003, Boyer was told that Clark Oil's listing on PTOs issued by Lakes meant that Clark Oil was holding the gas for the benefit of Lakes' customers. She was told that either by Stevenson or by Howard Sargeant; she cannot remember which. That was how Lakes operated from the time she started in 2003 up until 2008.

In 2008, Lakes' PTO customers began to exceed their customer credit limits with greater frequency. Exhibit 20 is an Excel spreadsheet of the July 2008 PTO transactions between Lakes and Clark Oil. Boyer created this spreadsheet and similar ones on a monthly basis which Howard Sargeant used to monitor Stevenson's PTO transactions. She also maintained a PTO reconciliation to track the income that Lakes was earning on Stevenson's PTO transactions.

Lakes issued an invoice on July 2, 2008 to existing customer L&S Gas Corp. for 294,000 gallons of propane at $1.84750 a gallon, or $543,165. Pursuant to the sale, Lakes issued PTO No. 50734, dated July 3, 2008, with a comment box notation, "lakes-l&s-clark oil@conway wms."

Lakes issued an invoice on July 15, 2008 to existing customer Fencl Oil & LP Co., Inc. for 189,000 gallons of propane at $1.90750 per gallon, a total of $360,517.50 (referencing PTO No. 50950), and a July 16, 2008 invoice to Fencl for 105,000 gallons at $1.86250 per gallon, a total of $195,562.50 (referencing PTO No. 50979). Lakes issued these PTOs with the comment "lakes-fencl-clark oil @ Conway wms."

Lakes issued an invoice on July 24, 2008 to existing customer Lou's LP for 336,000 gallons of propane at $1.72750 per gallon, a

total of $580,440 (referencing PTO No. 51113), and an invoice on July 25, 2008 for 84,000 gallons at a price of $1.71500 per gallon, a total of $144,060 (referencing PTO No. 51138). Lakes issued these PTOs with the comment "lakes-campbell-lou's-djfe-clark oil@ Conway wms."

On each of the foregoing July 2008 transactions involving L&S, Fencl, and Lou's, Lakes issued the PTOs as the "Issuing Customer," and the "Receiving Customer" was listed as Clark Oil. Stevenson represented to Clark Oil that the transactions were sales from Stevenson (Summit) to Clark Oil. Summit invoiced Clark Oil for the deliveries. Clark Oil paid Summit's invoices and then sold the gas as its own.

In early August 2008, Lakes learned that Summit was ceasing to do business. Lakes learned of discrepancies in its July 2008 PTO transactions when Ken Fencl sent an email to Balfanz on August 7, 2008. On August 8, 2008, Howard Sargeant called John Hohman to inquire about Clark Oil's trades with Summit and Stevenson. During that call, Sargeant informed Hohman that Lakes had "a problem, we buy a lot of gas and run it through Summit Energy."

Boyer determined that Stevenson had been buying propane in the names of Lakes customers, providing the customer with the purchase price which was then paid by the customer to Lakes Gas. Lakes claimed in a subsequent lawsuit that Stevenson falsely represented to Clark Oil that Summit was selling the gas, that Clark Oil would then pay Stevenson for the gas, that Stevenson would then pay the customer (Lou's, Fencl, or others), who would in turn pay the invoices issued to them by Lakes.

In each of the disputed July 2008 transactions, Boyer issued a

-20-

PTO on behalf of Lakes that identified Clark Oil as the receiving customer. Lakes transferred the propane pursuant to purchase orders purportedly solicited by Stevenson for a variety of customers. In each of those disputed transactions, Clark Oil paid Summit. In generating a PTO on the Williams system, Boyer thought she had identified in the Comment field each PTO customer in the transaction (i.e. the lineup). Lakes is identified on each of the PTOs as the Issuing Company and Clark Oil is identified as the Receiving customer. Both Howard Sargeant and Boyer maintain that Stevenson told them Clark Oil was holding the gas in its account at the Conway facility for the benefit of Lakes' Gas PTO customers. Ordinarily, there would be some type of agreement if Clark Oil had in fact been holding propane in storage for Lakes. Lakes had no such business relationship with Clark Oil. Lakes did not pay Clark Oil a fee to hold propane in storage. Neither Sargeant nor Boyer contacted a representative of Clark Oil to confirm Stevenson's representations. All invoices issued by Lakes to its customers were issued F.O.B. Conway.

On July 30, 2008, Campbell paid Lakes $974,925 in satisfaction of outstanding invoices, but Howard Sargeant voluntarily returned the money to Campbell.

Clark Oil Exhibit 50 is a September 4, 2008 letter from Howard Sargeant to Ken Fencl regarding July 15 and 16, 2008 invoices. In his letter, Sargeant states that because Stevenson had placed these orders without Fencl's knowledge or consent, Lakes would not hold Fencl responsible for payment of the invoices.

Stevenson declared bankruptcy and listed Lakes as a creditor. Lakes initially filed an objection to the Trustee's motion to dismiss

-21-

its complaint to revoke discharge, but Lakes subsequently dropped its objection because it determined it was not appropriate to pursue a denial of discharge.

## III. SUMMARY JUDGMENT STANDARDS

The standards for summary judgment are well-established. Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; Thomas v. Metropolitan Life Ins. Co., 631 F.3d 1153, 1160 (10th Cir. 2011). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc., 259 F.3d 1226, 1231–1232 (10th Cir. 2001) (citation omitted). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. In assessing a motion for summary judgment, the court must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193, 1196 (10th Cir. 2005).

The movant for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). It may meet that burden by pointing to an absence of evidence on an essential element of the non-moving party's claim. Id. at 325. If it meets this

burden, the non-movant must demonstrate a genuine dispute for trial on a material matter.  <u>See</u> <u>Concrete Works of Colorado, Inc. v. City & County of Denver</u>, 36 F.3d 1513, 1517 (10th Cir. 1994).  It must do so by citing to particular parts of materials in the record or by showing that the materials cited do not establish the absence of a genuine dispute.  <u>See</u> Fed.R.Civ.P. 56(c)(1).

**IV. SUMMARY OF ARGUMENTS**

Lakes contends Clark Oil is liable for conversion because Lakes held title to the gas in question, it never relinquished that title, and Clark Oil deprived Lakes of its title by selling the gas.  Lakes argues that under the Minnesota U.C.C. – which both parties agree controls here – Stevenson had no title to the gas and thus could not pass valid title to Clark Oil.  At best Stevenson had only a void title, Lakes asserts, because there was no "transaction of purchase" between Lakes and Stevenson. Without such a transaction, Lakes argues that Stevenson could not transfer good title even to an innocent purchaser.  Lakes says Clark Oil would have to show that Summit first acquired the gas in a transaction of purchase from Lakes and that Summit then delivered the gas to Clark Oil, neither of which it says occurred.  Lakes argues the UCC puts the risk of  fraud on Clark Oil in these circumstances because it was in the best position to guard against it.  It denies delivering or entrusting possession of the gas to Summit, saying Stevenson merely represented to Clark Oil that he owned the gas without producing any documentation to show title.  Moreover, it says Stevenson did not possess the gas, because he had no rights to any gas in the Williams Conway storage facility, the facility through which the transfers occurred.

-23-

Lakes also denies that Stevenson had any apparent authority to conduct the transactions on its behalf.  It says it never signaled to Clark Oil that Stevenson was acting on its behalf and that Clark Oil never even knew of the agency relationship between Lakes and Stevenson.  It contends Clark Oil cannot prove that Lakes held Stevenson out as its agent, asserting that Clark Oil "constantly had conversations with Stevenson regarding who was backing Stevenson and how he was getting the gas," to which Stevenson allegedly replied he was backed by "a mystery Florida investor who was getting a divorce." In sum, Lakes argues Clark Oil is liable because Stevenson was a converter, and Clark Oil only acquired the title of a converter. Plaintiff seeks partial summary judgment with respect to five transactions from July 2008. It seeks the value of the gas involved – a little over $1.8 million – plus prejudgment interest from August 8, 2008, the date the conversion was allegedly discovered.

In response, Clark Oil maintains that the doctrine of entrustment bars Lakes' claim.  It says Lakes entrusted the propane to Stevenson and thereby granted him voidable title to the gas. According to Clark Oil, "[t]he entrustment doctrine operates on the assumption that both the entruster and the buyer have been equally harmed by the dishonesty of the merchant-dealer, and resolves the issue in favor of the buyer."  Doc. 83-1 at 54 (citation omitted). It contends Stevenson's propane transfers could only occur with the acquiescence of Lakes, which issued PTOs affecting the transfers. Clark Oil says that for each of the disputed transactions, Lakes issued a PTO naming Clark Oil as the receiving customer, which resulted in the transfer of the propane to Clark Oil's storage account

at the Conway Williams storage facility. "On these facts," Clark Oil asserts, "the Court should find that Lakes entrusted Stevenson with the propane." It argues that Lakes conferred at least constructive possession of the propane on Stevenson, regardless of whether Stevenson was in physical possession of it.

Clark Oil also contends the claims are barred by the defenses of in pari delicto and "unclean hands." It points out that Howard Sargeant, the president and principal owner of Lakes, had extensive prior dealing with Stevenson including two occasions when Stevenson caused Lakes to incur substantial losses on propane trades. Sargeant also knew of Stevenson's practice of using fictitious buyers to circumvent credit limits, something he allegedly did on the transactions now challenged. Despite such prior knowledge, Lakes entered into a Sales Representative Agreement with Stevenson so that it could recoup losses from prior Stevenson transactions. Clark Oil also says that in 2007-08, Summit made substantial wire transfers to Lakes' account on behalf of purported buyers, although Lakes prohibited Stevenson from handling money on PTO transactions. Clark Oil says the evidence suggests Stevenson was using fictitious buyers and that Lakes knew it. In sum, Clark Oil argues that "Lakes Gas bears substantial – if not sole responsibility – for its losses in the July 2008 PTO transactions," such that equitable defenses bar the claims.

Finally, Clark Oil argues the court should deny Lakes' motion for summary judgment as a sanction for spoliation. Clark Oil maintains that Lakes destroyed electronic instant messages and failed to preserve email, in violation of its duty to preserve relevant electronic evidence. Clark Oil says the challenged transactions were

facilitated in part by instant messaging and email between Stevenson and two Lakes' employees, but Lakes destroyed or failed to preserve such evidence in its entirety after being on notice of potential litigation. Clark Oil says Lakes also failed to produce PTOs and other evidence in a timely fashion during discovery.

**V. DISCUSSION**

The parties agree that the disputed transactions involved the sale of goods and are governed by Article 2 of the Minnesota Uniform Commercial Code. Doc. 63 at 12; Doc. 82-1 at p.42, n.1.   Their arguments focus on Section 2-403 of the Minnesota Code, which provides in part:

**336.2-403.   Power   to   transfer;   good   faith   purchase   of   goods; "entrusting"**

> (1) A purchaser of goods acquires all title which the purchaser's transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
>
> (a) the transferor was deceived as to the identity of the purchaser, or
> (b) the delivery was in exchange for a check which is later dishonored, or
> (c) it was agreed that the transaction was to be a "cash sale," or
> (d) the delivery was procured through fraud punishable as larcenous under the criminal law.
>
> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives the merchant power to transfer all rights of the entruster to a buyer in ordinary course of business.

-26-

> (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.
>
> (4) The rights of other purchasers of goods and of lien creditors are governed by the articles on secured transactions (article 9) and documents of title (article 7).

M.S.A. §336.2-403.

1. 2-403(1). Under subsection (1), a buyer generally acquires whatever interest his seller had in the goods. See 1 White & Summers, Uniform Commercial Code §3-12 (5th ed.).[2] The reference in subsection (1) to any title which the purchaser's transferor "had power to transfer" means that the law of agency, apparent agency and estoppel apply in determining the extent of a seller's power to transfer title. Id. Under subsection (1), then, and with respect to the transactions in which Stevenson purported to sell propane to Clark Oil, Clark Oil would have obtained any title that Stevenson[3] had or that Stevenson had the power to transfer. But Clark Oil does not claim Stevenson had title to the transferred gas. And although Clark Oil makes some reference to the agency relationship between Lakes and Stevenson, it does not argue that Lakes gave Stevenson actual authority to transfer Lakes' propane. The undisputed facts show that Stevenson was not expressly authorized by Lakes to issue a PTO himself or to complete

---

[2] See generally Hampton Bank v. River City Yachts, Inc., 528 N.W.2d 880 (Minn.App. 1995) (extensively citing and relying on White & Summers).

[3] "Stevenson" is used here to mean both Stevenson and his company, Summit Propane.

a transfer of Lakes' propane to third parties such as Clark Oil. As for apparent authority, Clark Oil does not claim that Lakes in any way signaled to Clark Oil that it authorized Stevenson to make such transfers on its behalf. (Nor would such an argument be tenable on these facts – it is uncontroverted that Clark Oil was unaware of any agency relationship between Lakes and Stevenson at the time of the transactions and in fact believed that Stevenson was acting on his own behalf). In sum, Clark Oil does not claim that Stevenson conveyed any title to it under subsection (1) of 2-403. Rather, Clark Oil relies on the entrustment rule of subsection (2) and the defenses of in pari delicto and unclean hands.

    2.    <u>2-403(2) & (3) - Entrustment</u>. With respect to subsection (2), Stevenson was clearly a merchant who dealt in propane. Thus, "[a]ny entrusting of possession" of the propane to him by Lakes would have given Stevenson the power to transfer title to the gas to a buyer in the ordinary course of business.

    "Entrusting" includes "any delivery" of the goods from the entrustor (i.e. Lakes) to the entrustee (allegedly Stevenson/Summit). "Delivery" in turn means "the voluntary transfer of physical possession or control of goods." M.S.A. 336.2-103(1)(e).

    The official comments to the Minnesota code say subsections (2)-(4) of 2-403 are designed to protect "persons who buy in ordinary course out of inventory," although White & Summers note that nothing in the Code requires that goods be physically located in a seller's inventory to be considered entrusted. "Entrusting" typically falls into one of four fact patterns: (1) an owner leaves the goods with a dealer to resell; (2) a wholesaler delivers goods to a dealer's

-28-

inventory; (3) an owner leaves goods to be repaired with a person who also sells used goods of that kind; and (4) a buyer leaves the goods purchased in the seller's inventory. Anderson on the Uniform Commercial Code, 3A Anderson U.C.C. § 2-403:76 (3d. ed.).

According to White & Summers, problems arise because the UCC does not define possession. 1 White & Summers, Uniform Commercial Code, § 3-12 (5th ed.). White & Summers take the view that in determining whether there is possession for purpose of entrustment, the court should look beyond the fact of control to the dealer's <u>appearances</u> of control over the goods. <u>Id</u>. <u>See also</u> Anderson on Uniform Commercial Code, 3A Anderson U.C.C. § 2-403:95 (3d. ed.) ("Some courts have held that there has been a sufficient entrustment of the goods as long as the goods appear to be in the possession, and control, of the entrustee as the emphasis is upon the appearance of the situation to the [buyer] in the ordinary course of business. Thus, there may be an entrustment to the dealer/entrustee when goods are sent to the point designated by the dealer even though the goods are never placed on the entrustee's property or place of business."). <u>See also</u> <u>Stowell v. Cloquet Co-op Credit Union</u>, 557 N.W.2d 567, 571 (Minn. 1997) (because one of the purposes of the UCC is to foster nationwide uniformity in the application of commercial law, cases from other jurisdictions interpreting the Code should be given substantial weight).

The underlying purpose of section 2-403(2) is to facilitate the free flow of goods based on a buyer's reasonable expectation that a merchant in possession of goods it ordinarily sells has title to them:

The 2-403 requirement of a "merchant that deals

> in goods of that kind" restricts the Code
> definition of merchant in 2-104. Unlike the 2-104
> definition, which turns on the person's skill or
> knowledge, the concern of 2-403 is with a
> narrower class based on appearances. An
> individual buying a product from an apparent
> dealer in such goods expects to get good title.
> This expectation facilitates exchange. One cannot
> ascertain the seller's title without slowing
> commerce. One expects to get good title when
> buying a shiny new car from a General Motors
> dealer. On the other hand, one buying goods from
> a mere warehouseman trying to recover storage
> costs knows that the seller is dealing with
> somebody else's goods. Similarly, a buyer is
> expected to know that a broker deals with goods
> that are not the broker's own.

White & Summers, supra. See also Executive Coach Builders v. Bush & Cook Leasing, Inc., 81 Ohio App.3d 808, 812, 612 N.E.2d 408 (1992)(purpose of entrustment rule is to protect the purchaser where the latter acts in good faith and the owner takes the risk by placing or leaving the good with a merchant of his own choosing who could convert or otherwise misdeal it).

Under the uncontroverted facts, can it rationally be said that Lakes delivered the disputed propane to Stevenson? Certainly not insofar as physical possession of the goods are concerned. There was never any movement of propane; it remained in storage the entire time, under the direct control and possession of the Conway storage facility. But it is fair to say there was a transfer of the right to control the propane that was the subject of the disputed transactions. The right to control or direct propane stored at the Conway facility depended upon two things: a company having a storage-rights account, and execution of a PTO transferring the propane from the account of one storage lessee to another. Lakes emphasizes that Stevenson never had storage rights and was not listed on the PTOs that transferred

propane to Clark Oil. As such, it argues he never had control over the propane. Moreover, Lakes says there is no evidence that it intended Stevenson to have such control. But a jury viewing all the evidence might reasonably conclude that Lakes' actions created an appearance of Stevenson's control over the propane. How is it that Stevenson could represent to Clark Oil that he had specific amounts of propane to sell at a given time, and the promised propane would shortly thereafter be delivered to Clark Oil's account? Unless Stevenson had control over the propane and the ability to dispose of it, how is it that he – a third-party dealer ostensibly unconnected to Lakes – could promise delivery, arrange for such delivery, and then be the only one to invoice Clark Oil for the delivery? And the fact that this apparently went on over a period of years without objection or without even contact from Lakes would certainly reinforce the perception of a buyer in Clark Oil's position that Stevenson in fact had control over the gas and the legitimate ability to dispose of it through sale.

One reasonable view of the evidence – though not the only one – is that Lakes effectively entrusted its propane to Stevenson to sell to third parties. Under the Minnesota UCC, a delivery of goods means a voluntary transfer of physical possession <u>or control</u> of goods. Clark Oil has cited evidence that Lakes basically turned over PTO sales to Stevenson. And from the perspective of a buyer such as Clark Oil, Stevenson could reasonably be viewed as having control of the propane sold in these transactions because of the manner in which Lakes used him and his company as a "front man" on PTO sales. Lakes allowed Stevenson to make nearly all of the arrangements for PTO sales, and it relied on him exclusively to communicate with Clark Oil concerning

-31-

PTO transfers. Lakes had virtually no contact or communication with Clark Oil outside of cryptic PTOs transferring propane to Clark Oil's account. Insofar as Clark Oil was concerned, it was Stevenson of Summit Propane who agreed to and arranged the terms of sales. Stevenson was the only one to communicate with Clark Oil about the sales and the only one to demand payment for the product. The transfers occurred over an extended period, with Lakes repeatedly providing propane to Clark Oil upon request by Stevenson. Cf. Executive Coach Builders, 81 Ohio App. 3d at 83, 612 N.E.2d at 411 ("Under the 'appearance of control' test, we find that Gold Key had possession of the limousine for entrustment purposes. Even though the merchant here did not have actual physical possession of the limousine at the time of the sale to appellee, Gold Key nevertheless manifested its ability to control and dispose of the limousine as if it was in its inventory."). The fact that Stevenson arranged for delivery of the propane, demanded payment for it, and then received payment without objection from any other entity would convey to a reasonable buyer that Stevenson in fact had control of the propane provided by Lakes. This is particularly true given that Stevenson was able to arrange a number of apparently successful sales over time. Cf. Cugnini v. Reynolds Cattle Co., 687 P.2d 962, 966-67 (Colo. 1984) ("Reynolds ... observed the apparent control that Russell had over the cattle and concluded that they belonged to him.").

Howard Sargeant says Lakes transferred the gas to Clark Oil based on a belief that Lakes' customers had storage arrangements with Clark Oil and that Clark Oil was holding the gas for these customers. That belief was apparently based on fraudulent representations from

Stevenson. Even so, under 2-403(3) the fact that a delivery was induced by fraud does not prevent an entrustment from being found. M.S.A. §336.2-403, Comment 2 (technicalities of larceny do not effect the entrustment doctrine). See also Executive Coach Builders, 81 Ohio App.3d at 812, 612 N.E.2d 408 ("Entrustment should be given a liberal reading. Professor Grant Gilmore, one of the drafters of the UCC, stated that the Code 'defines 'entrusting' as including everything short of armed robbery (larceny is expressly approved)."). And Clark Oil has cited instances of Lakes disregarding its own purported restrictions on Stevenson's handling of PTO transactions, including at times apparently allowing him to dictate even the price on PTO sales. There is evidence that Stevenson instructed Lakes as to all facets of the terms of the PTOs. Significantly, Clark Oil cites evidence that despite Lakes' stated policy of not allowing Stevenson to handle money on PTO sales – a policy borne out of knowledge that Stevenson had a history of using straw purchasers – Stevenson in fact wired tens of millions of dollars into Lakes' NAE account for PTO sales, thereby clearly indicating that he was involved as a party to sale transactions. Lakes' asserted explanation that it did not notice the money was coming directly from Stevenson strains credulity, to say the least, particularly given a pattern suggesting that Stevenson repeatedly made account payments to Lakes so that new sale transactions could be conducted. Viewed in a light most favorable to defendant, the summary judgment evidence shows that Lakes was willing to allow Stevenson to make under-the-table arrangements involving Lakes propane so as long as the money flowed in. Once propane was diverted, however, and the piper came calling, Lakes took the position

-33-

that Stevenson was a mere solicitor of orders rather than its dealer in charge of PTO sales.

As noted above, the purpose of the UCC entrustment rule is to protect a good-faith purchaser where the owner of the goods "takes the risk by placing or leaving his chattel with a merchant of his own choosing who could convert it or otherwise misdeal it." Locke v. Arabi Grain & Elev. Co., Inc., 197 Ga.App. 854, 856, 399 S.E.2d 705 (1990). Lakes chose Stevenson, a propane merchant with a checkered past, and arguably gave him carte blanche to arrange PTO sales of its product. A jury considering all of the circumstances of the relationship could find that Lakes voluntarily transferred control over Lakes propane to Stevenson and thereby allowed him to sell it to third parties.

3. Ordinary Course of Business. Even if goods are entrusted within the meaning of 2-403(2), title will pass only to a buyer in the ordinary course of business. Lakes argues the evidence shows Clark Oil did not comport with usual or customary practices in buying propane from Stevenson, and was therefore not a buyer in the ordinary course.

Under M.S.A. § 336.1-201(9):

> "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of

> title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under article 2 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

"Good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." M.S.A. §336.1-201(20). "Knowledge" means actual knowledge. M.S.A. §336.1-202(b).

"Under Minnesota law, the good faith test is a subjective rather than objective test. It requires honesty of intent rather than the absence of circumstances which would put an ordinarily prudent purchaser on inquiry. It is an issue of honesty of intent rather than of diligence or negligence." Schluter v. United Farmers Elevator, 479 N.W.2d 82, 85 (Minn.App. 1991) (citing Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, 296 Minn. 130, 136, 207 N.W.2d 282, 287 (1973)).

Lakes relies on various aspects of Clark Oil's purchases to argue that they did not comport with usual and customary practice. For example, it notes that Clark Oil required prepayments from Stevenson, something it did not do for all of its customers. But the evidence suggests propane dealers sometimes imposed limitations or payment requirements on particular entities that were considered credit risks. Lakes also says that Stevenson could not guarantee dates of delivery and that the terms of delivery were negotiated for every deal. Such factors might be probative of unusual practices in the industry, but Lakes fails to show as a matter of law that they were outside of normal practice or that they would necessarily suggest to a propane merchant that the sales violated a third party's rights. The most

significant factor relied upon by Lakes is that Summit's name did not appear in the lineup of parties in the Comment field of the PTOs. Lakes argues that this shows Clark Oil had knowledge that the sale violated the rights of others, and says Clark Oil's practice of hand-writing Summit into the lineup on Clark Oil's internal documentation bolsters that fact. The court agrees with Lakes insofar as it contends that Summit's absence from the PTO lineup should have been a "red flag" to Clark Oil prompting further inquiry. The evidence shows it was a common practice to list parties involved in a transaction in the PTO lineup, and Hohman of Clark Oil told Stevenson that Summit should be in the lineup when the purchases first began. But there is evidence that the listing of a complete lineup on a PTO was not considered mandatory, and in fact both parties engaged in transactions without listing all interested parties. For example, Lakes engaged in dozens of sales to Hansen despite the fact that Hansen was not listed in the PTO lineup. Like Clark Oil, Lakes made hand-written additions to the PTO after-the-fact to document these sales for its own records. Lakes engaged in "split sale" transactions, where a single PTO was used for multiple buyers without listing all of the purchasers on the PTO. There is some evidence that propane sellers were typically unconcerned with intermediate or subsequent steps in a series of buy-and-sell transactions, and focused only on the immediate seller's delivery of promised gas and the receiving purchaser's payment for gas received. As for Clark Oil's asserted purchases from Summit, these transactions were carried out over an extended period without Summit being listed in the lineup, until it simply became the parties' standard practice. The initial red flag may have faded into insignificance as purchases

were repeatedly carried out without any objections or apparent problems. Whether or not such a practice was contrary to industry custom, and whether or not Clark Oil can be said to have had actual knowledge that the sales violated the rights of others, are genuine issues of fact on the record now before the court. See Foy v. First Natl. Bank of Elkhart, 868 F.2d 251, 254 (7th Cir. 1989) (whether a buyer is in the ordinary course of business is generally a question of fact); Wohlrabe v. Pownell, 307 N.W.2d 478, 483 (Minn. 1981)(it is not sufficient that there be circumstances or suspicions such as would put a careful purchaser upon inquiry; subjective good faith is simply the honest belief that your conduct is rightful).

    4.  Unclean Hands/In Pari Delicto. Clark Oil contends Lakes' claims are barred by the doctrines of in pari delicto and unclean hands.[4]

    An initial stumbling block to Clark Oil's defenses, at least insofar as the claim of conversion is concerned, is that the only case to address the matter has concluded that Minnesota law would not allow equitable defenses on a claim for damages. See Bieter v. Blomquist, 848 F.Supp. 1446, 1451 (D. Minn. 1994)("Because the Court finds no indication that Minnesota courts have expanded the availability of equitable defenses to actions for damages, it

_____

    [4] The court rejects Lakes' argument that Clark Oil has waived reliance on the principle of in pari delicto because Clark Oil's answer listed the defense as "unclean hands." The two doctrines are closely related; in fact, in pari delicto is said to be a corollary of the unclean hands doctrine. See 27A Am.Jur.2d Equity §103. Lakes has established no surprise or prejudice from Clark Oil's reliance on the doctrine, and the court concludes that Clark Oil has not waived it. See Loxley South, L.L.C. v. Western Express, Inc., 2011 WL 2469823, *2 n.4 (S.D. Ala. 2011).

concludes that unclean hands is not a valid defense to Bieter's claim for tortious interference."). Other Minnesota decisions likewise indicate that equitable defenses serve only to restrict the availability of equitable, not legal, relief. See e.g., Heidbreder v. Carton, 645 N.W.2d 355, 371 (Minn. 2002); Based on these decisions, the court concludes the Minnesota Supreme Court likely would not recognize unclean hands or in pari materia as a defense to a claim for damages under a conversion theory. The defense could be potentially available, however, on Lakes' claim of unjust enrichment. See e.g., Progressive Technologies, Inc. v. Shupe, 2005 WL 832059 (Minn.App. 2005) ("To the extent Progressive's underlying claim is contractual, it is not a claim for equitable relief. Thus, unclean hands is not a defense to the contractual claim. However, the district court also granted summary judgment to Progressive on a theory of the equitable claim of unjust enrichment. [Thus] we consider appellant's defense of unclean hands for this limited purpose.").

A second hurdle to the defense is the UCC. Section 336.1-103(b) of the Minnesota Code provides that unless  displaced by the particular provisions of the UCC, the principles of law and equity supplement the Code's provisions. But the comments make clear that resort to equitable principles is limited:

> [T]he Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may supplement provisions of the Uniform Commercial Code, they may not be used to supplant its provisions, or the purposes and policies those provisions reflect, unless a specific provision

-38-

> of the Uniform Commercial Code provides
> otherwise. In the absence of such a provision,
> the Uniform Commercial Code preempts principles
> of common law and equity that are inconsistent
> with either its provisions or its purposes and
> policies.

Id., Comment 2.

Section 2-403 of the Code allocates the risk of loss among parties to sales transactions generally, and specifically addresses the consequences of entrusting goods to a merchant in the business of selling such goods, even where the entrustment has occurred as a result of fraud or larceny. Cf. First Nat. Bank of Blooming Prairie v. Olsen, 403 N.W.2d 661, 666 (Minn.App.1987) (Where UCC provisions are determinative, the application of equitable principles is unnecessary). The section is designed not only to protect good faith purchasers, but more broadly to ensure the free flow of commerce by establishing clear ground rules for transfers of goods. These policies could be undermined by easy resort to equitable defenses that upend the remedial scheme adopted by the Code. Whether or not application of "unclean hands" would do so here depends on the circumstances surrounding these transactions and the relationships among all of the entities involved. That in turn requires a determination of the facts from all of the evidence. And only based on such facts could the court determine if application of the defense is warranted, and whether it would violate a policy underlying section 2-403. Cf. Foy v. Klapmeier, 992 F.2d 774, 779 (8th Cir. 1993) (unclean hands is a matter for discretion of the district court; defense is applied only where a party's conduct has been unconscionable). The court concludes that the matter is inappropriate for determination on this summary judgment

record.

    5. <u>Spoliation of Evidence & Discovery - Sanctions</u>. Clark Oil argues that Lakes spoliated evidence and was dilatory in producing discovery. It argues that the court should deny Lakes' Motion for Summary Judgment as a sanction for such conduct.

    Spoliation sanctions are proper when (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence. <u>Turner v. Public Service Co. of Colorado</u>, 563 F.3d 1136, 1149 (10th Cir. 2009). If the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith. <u>Id</u>. Without a showing of bad faith, a district court may only impose lesser sanctions. <u>Id</u>. [citations omitted].

    It seems clear there was some loss of evidence in this case – in the form of certain email and/or "instant messages" – from Lakes' computer records, at a time when Lakes knew litigation was imminent. The evidence suggests the loss was inadvertent. No claim of bad faith is made and no evidence is cited to support such a finding. In these circumstances, the court looks to the culpability of those involved and the relevance of the proof to the issues at hand. <u>HR Technology, Inc. v. Imura Intern. U.S.A., Inc.</u>, 2010 WL 4792388, *2 (D. Kan. 2010). While it is possible that the lost materials contained some relevant evidence, Clark Oil's claim of prejudice from the loss is largely speculative. <u>Cf</u>. <u>Turner</u>, 563 F.3d at 1150 ("there is no evidence that Turner was 'actually, rather than merely theoretically' prejudiced by their loss."). The court also notes that Clark Oil did not pursue discovery sanctions before the Magistrate on the matter and

did not pursue all avenues of discovery that might have helped mitigate any loss of relevant evidence. After considering the circumstances, the court concludes that the requested sanction of denying plaintiff's motion for summary judgment is not warranted.

## VI. CONCLUSION

Clark Oil's unopposed Motions to Amend Memoranda (Docs. 82 and 83) are GRANTED;

Lakes' Motion for Partial Summary Judgment (Doc. 62) is DENIED; and

Clark Oil's Motion for Summary Judgment (Doc. 80) is DENIED.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. <u>Comeau v. Rupp</u>, 810 F.Supp. 1172 (D.Kan.1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this    21st    day of June 2012, at Wichita, Kansas.


                                    s/ Monti Belot
                                    Monti L. Belot
                                    UNITED STATES DISTRICT JUDGE